**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRAIG KALINOSKI, | CIVIL ACTION NO. 3:10-CV-0314 |
| Plaintiff, | |
| v. | (JUDGE CAPUTO) |
| LACKAWANNA COUNTY, et al., | |
| Defendants. | |

**MEMORANDUM**

Presently before the Court is a motion for summary judgment brought by Defendants Lackawanna County, Corey O'Brien, and Michael Washo (Doc. 36). Because there are genuine issues of material fact as to whether Defendants' termination of Plaintiff was procedurally legislative, whether Defendants engaged in unconstitutional political patronage, and whether Defendants acted with reckless indifference to Plaintiff's constitutional rights, summary judgment will be denied.

**I. Background**

**A. Kalinoski's Employment with the Office of the Public Defender**

Craig Kalinoski is a former Assistant Public Defender in the Office of the Public Defender ("OPD") in Lackawanna County ("the County"). (Def. Stmt. ¶ 1.) Kalinoski obtained his JD from Widener University School of Law in 2003. (Def. Ex. E at 2.) While in law school, Kalinoski worked as an extern at the OPD. (Pl. Stmt. ¶ 3.) In approximately February of 2004, Kalinoski learned via "word of mouth" that there were

1

full-time public defender positions open at the OPD. (Def. Stmt. ¶ 4.) Between January 6 and 27, 2004, eleven Lackawanna County public defenders had been terminated. (Def. Ex. B at 145, 160-62; Ex. C at 34-43; Ex. D.)

Kalinoski interviewed with John Cerra, the new Chief Public Defender at the time, and Robert Cordaro, the County Commissioner at the time, and was offered a position with the OPD. (Def. Ex. A at 19-20.) After meeting with Cordaro and accepting the job, Kalinoski filled out an application for "paperwork purposes." (Pl. Stmt. ¶ 5.) On that application, Kalinoski listed as his references a Republican judge and an employee of a former Republican Senator. (Def. Stmt. ¶ 6.) At the time he was hired, Kalinoski was a registered Republican. (Def. Stmt. ¶ 11.)

Kalinoski began working at the OPD on March 22, 2004. (Def. Ex. A at 17:20-21.) Former Chief Public Defender Cerra characterized Kalinoski's job performance as "excellent." (Pl. Stmt. ¶ 1(a).) During his time at the OPD, Kalinoski tried two jury trials. (Pl. Stmt. ¶ 9.) In general, there are not many criminal trials in Lackawanna County. (Pl. Stmt. ¶ 9.) While working full time at the OPD, Kalinoski also maintained a private practice. (Def. Stmt. ¶¶ 7-8.) Kalinoski testified that his job at OPD was his priority during work hours. (Pl. Stmt. ¶ 8.) Several of the current Assistant Public Defenders, including Joseph McGraw, also maintain private practices. (Pl. Ex. 12 at 30:6-36:24.)

**B. 2007 County Commissioner Election and Administration Change**

In 2007, there was a Lackawanna County election for the office of County Commissioner. (Def. Stmt. ¶ 13.) Cordaro and A.J. Munchak, the incumbent Republican Commissioners, ran to retain their positions. (*Id.*) Kalinoski supported Cordaro and Munchak in the election, though he did not get involved in the campaign. (Def. Stmt.

2

¶ 14.)  Kalinoski met Corey O'Brien and Michael Washo, the Democratic candidates, at a fundraiser for state Representative Frank Andrews Shimkus (at that time, a Democrat).  (Def. Stmt. ¶ 16; Pl. Ex. 8 at 63:13-21.)  Kalinoski's wife at the time, Jessica, worked for Representative Shimkus and supported the Democratic candidates for County Commissioner.  (Def. Stmt. ¶ 15; Pl. Ex. 8 at 63:13-21.)  O'Brien and Washo both spoke with Kalinoski about the OPD.  (Pl. Stmt. ¶ 14.)  Kalinoski testifies that O'Brien and Washo then asked Kalinoski to support their campaign ("the Washo-O'Brien Campaign"), but he advised them that he supported the Republican ticket.  (*Id.*)  Defendants admit to meeting Kalinoski, but deny asking him for political support or learning his political affiliation.

O'Brien and Washo won the election, and shortly thereafter, they began investigating the operations of various county offices and departments.  (Def. Stmt. ¶ 19.)  In particular, O'Brien and Washo heard complaints about the OPD.  (Def. Stmt. ¶ 22.)  They created a Courthouse Transition Team ("the Transition Team") to investigate and make recommendations about the organization and structure of the office.  (Def. Stmt. ¶ 25.)  The Transition Team consisted of Gerard Karam, former Chief Public Defender until January 2004; Bob Munley, who worked at the OPD under Karam; attorney Chris Munley; and attorney Jeff Nepa.  (Def. Stmt. ¶ 26.)  All members of the Transition Team had been financial contributors to the Washo-O'Brien Campaign.  (Pl. Stmt. ¶ 26.)

Washo testified that judges in the Common Pleas Court of Lackawanna County made him aware of a "total breakdown in the administration of justice" and "a totally chaotic condition" in the OPD.  (Pl. Stmt. ¶ 1(d).)  Karam met with several Lackawanna County judges about restructuring the OPD, and testified that Judge Barasse had

3

complained to him that the public defenders were not at the courthouse during business hours, were not working full time, did not have enough experience, and did not try enough cases.  (Def. Stmt. ¶ 27; Def. Ex. G at 47.)

The Transition Team e-mailed recommendations for restructuring the OPD to O'Brien and Washo on December 12, 2007.  (Pl. Stmt. ¶ 33.)  O'Brien and Washo accepted the recommendations, but continued to discuss specifics regarding choosing candidates for particular positions.  (Def. Stmt. ¶ 26.)  At the beginning of O'Brien's and Washo's transition into office, O'Brien created a document called "The Washo O'Brien Hiring Chart."  (Pl. Stmt. ¶ 20(a).)  O'Brien updated the document throughout the transition process.  (*Id.*)  The chart listed various appointments and terminations for positions throughout the county.  (*Id.*)  A version of the chart was e-mailed by O'Brien to a budget director on January 13, 2008.  (*Id.*)

## C. Kalinoski's Termination

On January 4, 2008, Defendants placed an advertisement in the classifieds section of a local newspaper, seeking applicants for public defender positions at the OPD.  (Def. Stmt. ¶ 37.)  The ad set a deadline of January 14, 2008 for the receipt of applications.  (*Id.*)  Kalinoski saw the ad in the paper and contacted attorney Larry Moran, who he had heard might be the next Chief Public Defender and would be making hiring decisions.  (Def. Stmt. ¶¶ 39-40.)  Kalinoski then submitted a cover letter and a résumé expressing an interest in two of the full-time public defender positions.  (Def. Stmt. ¶ 42.)  Kalinoski was never contacted about his application.  (Pl. Ex. 8 at 71:10.)  Eventually, Sidney Prejean, the newly appointed Chief Public Defender, called Kalinoski into his

4

office and told Kalinoski that he was terminated.  (Pl. Stmt. ¶ 42.)

During the hiring process, O'Brien did not interview any of the public defender candidates and did not review their written application materials.  (Pl. Ex. 11 at 59:22-60:12.)  The Transition Team also did not conduct any interview of the candidates, but Karam reviewed the written materials.  (Pl. Ex. 9 at 66:6-11; Def. Ex. G at 61:22-62:7.)  O'Brien and Washo attended one meeting with the Transition Team to go over their recommendations, some time after January 7, 2008.  (Def. Ex. I at 46:23-48:1.)  O'Brien and Washo made the final decision regarding who to hire and terminate in the OPD.  (Def. Stmt. ¶ 56.)

The Transition Team discussed Kalinoski at the meeting with O'Brien and Washo.  (Def. Stmt. ¶¶ 49-53.)  O'Brien's handwritten notes from that meeting have the name "Frank Andrews" next to Kalinoski's name.  (Pl. Stmt. ¶ 41.)  O'Brien testified that he believed that note was a reference to the fact that Kalinoski had received a recommendation from Representative Shimkus (who was also known as Frank Andrews); Kalinoski denies contacting the representative for a recommendation.  (Def. Ex. I at 95-96; Pl. Stmt. ¶ 41.)  During the meeting, Karam conveyed that Judge Barasse's only comment regarding Kalinoski was that he conflicted out of too many cases.  (Def. Stmt. ¶ 30.)  Karam additionally recalled sharing at the meeting that Nepa had previously had two interactions with Kalinoski that Nepa thought reflected negatively on Kalinoski's character.  (Def. Stmt. ¶ 52.)  Finally, at the meeting, Karam and attorney Larry Moran discussed a prior civil case that they did not feel that Kalinoski handled appropriately.  (Def. Stmt. ¶ 53.)

Neither the County, O'Brien, nor Washo consulted with Cerra regarding Kalinoski's

job performance prior to terminating Kalinoski. (Pl. Stmt. ¶ 1(a).) Washo testified that he was unaware of any specific performance deficiencies on the part of Kalinoski. (Pl. Stmt. ¶ 1(d).) Karam testified that the Transition Team did not recommend that anyone be terminated. (Pl. Stmt. ¶ 22.)

**D. Defendants' Other Hiring Decisions**

O'Brien and Washo did not terminate everyone who had worked at the OPD under the previous administration. (Pl. Stmt. ¶ 11.) They retained Assistant Public Defender Jody Kalinowski, for example. (*Id.*) Additionally, they retained at least one employee who had been involved in the Cordaro-Munchak campaign. (Def. Stmt. ¶ 21.)

One of the new candidates hired was Joseph McGraw, who had graduated from law school in May 2006 and been a licensed attorney for approximately fifteen months. (Pl. Stmt. ¶ 45(i).) McGraw was recommended by Nepa as well as Chris and Bob Munley. (Def. Ex. G at 76:14-24.) McGraw had previously worked with Chris Munley; Bob Munley and Nepa had worked with McGraw's family members. (Pl. Stmt. ¶ 45(a)-(c)). McGraw had met O'Brien and Washo in the summer of 2007 when Chris Munley invited McGraw to come to his office and meet them. (Pl. Stmt. ¶ 54(e).) McGraw applied to the OPD prior to the publication of the classified ad; several other candidates did as well. (Pl. Stmt. ¶ 45(g).)

Kalinoski asserts (and Defendants dispute) that during the Transition Team meeting with O'Brien and Washo, there was discussion of the public defender candidates' political affiliations and conduct during the campaign. (Pl. Stmt. ¶ 47.) O'Brien and Washo also hired several candidates who had recommendations from or

6

family connections with individuals who had contributed money to the Washo-O'Brien campaign. (Pl. Stmt. ¶ 47.) Additionally, O'Brien and Washo hired some candidates who had themselves contributed money or otherwise supported the campaign. (*Id.*) One of these candidates was known to have a drug and alcohol problem. (*Id.*)

**E. Litigation**

On February 11, 2010, Kalinoski filed a complaint against O'Brien, Washo, and the County. (Doc. 1.) He amended the complaint on March 12, 2010. (Doc. 7.) Kalinoski brings his complaint under 42 U.S.C. § 1983 and alleges that O'Brien and Washo violated his First Amendment rights by terminating him because of his political affiliation or, alternately, by terminating him in order to make room for McGraw, a politically favored job candidate. Kalinoski further alleges that the County is liable for O'Brien's and Washo's unconstitutional conduct because their conduct constituted government policy.

Defendants filed this motion for summary judgment on November 15, 2010. (Doc. 36.) The motion has been fully briefed and is ripe for disposition.

## II. Discussion

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there

is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

**B. Legislative Immunity**

Defendants first challenge Kalinoski's suit on the grounds that O'Brien and Washo are entitled to legislative immunity.[1] Local legislators are absolutely immune from suit in their individual capacities under § 1983 for "all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). Legislative immunity applies to acts within the "legislative sphere" even where the conduct, "if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973). This immunity is based on the Speech or Debate Clause of the United States Constitution. *Id.* at 49 (quoting *Tenney*, 341 U.S. at 372-75); *see also* U.S. Const. Art. I, § 6, cl. 1.

An act is legislative, and thus covered by absolute immunity, if it is "both substantively and procedurally legislative in nature." *In re Montgomery Cnty.*, 215 F.3d 367, 376 (3d Cir. 2000) (citing *Carver v. Foerster*, 102 F.3d 96, 100 (3d Cir. 1996)). "An

---

[1] The County cannot assert this defense, however, as "unlike various government officials, municipalities do not enjoy immunity from suit–either absolute or qualified–under § 1983." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993).

8

act is substantively legislative if it involves 'policy-making of a general purpose' or 'line-drawing'" and "[i]t is procedurally legislative if it is undertaken 'by means of established legislative procedures.'" *Id*.  The motive or intent of an individual performing an act is irrelevant to whether it is legislative.  *Bogan*, 523 U.S. at 55.

Although "firing a particular employee is a personnel decision that does not involve general policymaking," the termination of an employee resulting from a change in policy regarding a department may be legislative.  In *In re Montgomery County*, the Third Circuit held that a Salary Board taking a vote to fire a particular employee was not substantively legislative.  215 F.3d at 377.  In *Bogan v. Scott-Harris*, however, the termination of one employee was both procedurally and substantively legislative where the mayor introduced a budget, took a vote, and signed into a law an ordinance eliminating the employee's department.  523 U.S. at 47.  The Supreme Court reasoned that the act "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."  *Id.* at 55-56.

Here, Kalinoski's termination was substantively legislative because it was a discretionary policymaking decision.  It did not involve the singling out of one employee for termination, as was the case in *Mongtomery County*.  Rather, the termination was more similar to the termination in *Bogan*: it was a part of a larger plan of reorganization based on departmental concerns unrelated to one employee in particular.  Kalinoski's termination in fact is more obviously substantive than the one in *Bogan* because it affected many more individuals than just one plaintiff.  Kalinoski argues that O'Brien and Washo cannot be granted immunity because of their discriminatory motive, but as noted above, motive is irrelevant to a legislative immunity determination.  Even if O'Brien and

Washo restructured the OPD in order to achieve an unconstitutional purpose, they still can be shielded from liability if their actions were legislative in nature.

It is less clear, however, whether Kalinoski's termination was procedurally legislative. For an action to be procedurally legislative, the legislative actors must have followed the "'statutory procedures specified for such action.'" *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 172 (3d Cir. 2006) (quoting *Acierno v. Cloutier*, 40 F.3d 597, 613 (3d Cir. 1994)). Defendants argue that the action was procedurally legislative because O'Brien and Washo established a Transition Team to provide recommendations for the reorganization of the OPD and then accepting those recommendations. Kalinoski argues that his termination was not procedurally legislative because O'Brien and Washo did not consult with the third County Commissioner, conduct a vote, or hold a public meeting on the issue. There is no doubt that the reorganization of departments and the appointment of employees are both within the legislative powers of Lackawanna County Commissioners. 335 Pa. Code § 1.3-302(j), (l). Neither party, however, has presented evidence documenting the statutory procedures specified for a reorganization of a Lackawanna County department. There is thus a genuine issue of material fact as to whether the formation of the Transition Team was sufficient to render the reorganization procedurally legislative or whether O'Brien and Washo ignored procedural requirements by neglecting to hold a vote or a meeting. Because there is insufficient evidence to determine whether the termination of Kalinoski was undertaken by means of established legislative procedures, summary judgment on the issue of legislative immunity must be denied.

**C. 42 U.S.C. § 1983**

Kalinoski brings his claim under 42 U.S.C. § 1983, which states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or any other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (internal quotation omitted).  To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law.  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).  The parties do not dispute that at all relevant times, Defendants were acting under color of state law.  Rather, the dispute surrounds whether Defendants' actions in terminating Kalinoksi constituted political patronage discrimination, resulting in a deprivation of Kalinoski's rights under the First Amendment.

A municipality may be subject to liability under § 1983 where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [a constitutional] injury."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).  One way to establish that an individual's conduct implements official policy is to show that "the individual himself has final policy-making authority such that his conduct represents official policy."

11

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (citations omitted).  O'Brien and Washo, as County Commissioners, were final policy makers for Lackawanna County, *See Wallace v. Powell*, No. 3:09-cv-286, 2009 WL 6850318, at *9 (M.D. Pa. Nov. 20, 2009) ("One can hardly imagine a more 'final' decision-maker for the municipality [than the County Commissioners]."), and so their decision to restructure the OPD and terminate Kalinoski represented official Lackawanna County policy.  Therefore, the County will be liable for their actions if those actions inflicted a constitutional injury.

### 1. First Amendment Violation

Kalinoski presents two alternate theories of how the Defendants violated his First Amendment rights: he argues that he was fired either because of his affiliation as a Republican or because of Defendants' desire to make room for a politically favored candidate, Joseph McGraw.  Both are theories of political patronage discrimination and should be analyzed under the framework set out by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 360 (1976), and *Branti v. Finkel*, 445 U.S. 507, 515 (1980).

The First Amendment protects public employees from termination or other employment decisions based on political affiliation, unless party affiliation is an appropriate requirement for the position.  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990); *see also Branti*, 445 U.S. at 515 ("If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes."); *Elrod*, 427 U.S. at 360 ("The threat of dismissal for failure to provide [political] support unquestionably inhibits protected belief and association.").  The Third Circuit uses a three-part test based to determine whether a plaintiff has made out a prima facie case of discrimination based on political patronage,

12

and then the burden shifts to the defendant. *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007) (citations omitted). The test is "flexible" and "extremely fact intensive." *Armour v. Cnty. of Beaver*, 271 F.3d 417, 429 (3d Cir. 2001).

To establish a prima facie case, the plaintiff must first show that he "was employed at a public agency in a position that does not require political affiliation." Galli, 490 F.3d at 271. Second, the plaintiff must demonstrate that he "was engaged in constitutionally protected conduct."[2] *Id.* Third, the plaintiff must prove that "this conduct was a substantial or motivating factor in the government's employment decision." *Id.* If the plaintiff succeeds in establishing a prima facie case, the defendant may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Both parties agree that the position of Assistant Public Defender does not require political affiliation. Thus, Kalinoski satisfies the first element of the *Elrod-Branti* test. The other two elements, as well as the Defendants' burden, will be addressed in turn.

### a. Constitutionally Protected Conduct

The constitutionally protected activity prong is fairly broad, encompassing not only political party affiliation, *see Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 663-64

---

[2] Plaintiff asserts that under his theory of a politically favored job candidate, this element is not required. This argument, however, is based on Plaintiff's misreading of *Conjour v. Whitehall Twp.*, 850 F. Supp. 309, 31 (E.D. Pa. 1994). Under the politically favored job candidate theory, a plaintiff must still prove that he engaged in constitutionally protected conduct–but that conduct is the plaintiff's protected "right not to support a candidate" as opposed to the plaintiff's active support of an opposing candidate or party. *See id.* (citing *Bennis v. Gable*, 823 F.2d 723, 721 (3d Cir. 1987)).

(3d Cir. 2002), but also failure to support a particular candidate or a lack of any political affiliation at all, *see Galli*, 490 F.3d 272-73.  Here, Kalinoski has presented evidence that he is a registered Republican who supported the Republican candidates for Lackawanna County Commissioner in the 2007 election.  Defendants suggest that Kalinoski's decision to seek support from Democrats Moran and Representative Andrews establish that he was not connected to the Republican party and thus not engaged in protected activity.  A reasonable jury, however, could find that Kalinoski reached out to the Democrats merely to protect himself because of his Republican party affiliation or because of his lack of support for the Washo-O'Brien campaign.  Thus, there is a genuine issue of material fact as to whether Kalinoski engaged in constitutionally protected conduct.

### b. Conduct as Substantial or Motivating Factor in Employment Decision

To prove that his political affiliation was a substantial or motivating factor in the Defendants' decision to terminate his employment, Kalinoski must establish both knowledge and causation.  *Id.* at 275 (citing *Goodman*, 293 F.3d at 664).  A plaintiff may demonstrate knowledge and causation through direct or circumstantial evidence. *Delhagen v. McDowell*, 703 F. Supp. 2d 467, 476 (M.D. Pa. 2010) (citing *Goodman*, 293 F.3d at 664).

#### i. Knowledge

Kalinoski must show that O'Brien and Washo knew of his Republican affiliation or, alternately, his lack of support for the Washo-O'Brien campaign.  Here, Kalinoski has testified that he directly told both O'Brien and Washo that he did not support their candidacies.  The Defendants argue that the Transition Team did not have knowledge of Kalinoski's political affiliation, but this does not refute Kalinoski's argument that O'Brien

14

and Washo knew--and they were the final decision makers.  Additionally, Defendants point out that O'Brien's notes associated Kalinoski with Frank Shimkus, a Democratic state representative, suggesting that O'Brien and Washo presumed that Kalinoski was affiliated with the Democrats.  But examining the facts in the light most favorable to Kalinoski, his testimony regarding his conversations with O'Brien and Washo shows that even if they believed he was affiliated with Representative Shimkus, they were aware that he had not supported their candidacies.  Thus, a reasonable jury could find that the Defendants had knowledge of Kalinoski's political affiliation or lack of support for the Washo-O'Brien campaign.

### ii. Causation

Kalinoski must also prove that his political affiliation (or alternately, Defendants' desire to install a politically favored candidate) was a substantial or motivating factor in Defendants' decision to terminate his employment with the OPD.  Plaintiffs may present a variety of evidence to establish causation.  In *Galli v. New Jersey Meadowlands Commission*, for example, a former government employee alleged that she was terminated on the basis of her political affiliation by a newly appointed Commissioner. 490 F.3d at 269.  The former employee presented evidence that she was qualified for her job and performed well, but was replaced with an unqualified individual who had been active in the Commissioner's campaign.  *Id.* at 276.  She also showed that there was suspicious timing in her termination, alleging that the Commissioner offered her job to someone before she was even terminated.  *Id.*  Finally, she challenged the Commissioner's argument that the termination occurred as part of a larger reorganization plan to streamline the Commission, noting in particular that there was no documentation

15

of the plan and that the Commissioner's decision to hire more employees than it fired was inconsistent with a goal of streamlining. *Id.* Based on all this, the Third Circuit held that the former employee had alleged sufficient evidence to defeat summary judgment. *Id.*

Kalinoski presents evidence very similar to the evidence in *Galli*. First, he has presented evidence that he was qualified for the Assistant Public Defender position, had received favorable job reviews from the prior Chief Public Defender, and that Judge Barasse's comment regarding his "conflicting out" of cases was benign. He also alleged that the Defendants hired candidates that were less qualified but had connections with the Democratic Party. In particular, Kalinoski cites McGraw's short time as a licensed attorneys and another candidate's substance abuse issues. He also alleges that McGraw had extensive connections with those involved in the Washo-O'Brien campaign. Kalinoski further suggests that there was suspicious timing, arguing that the Washo-O'Brien Hiring Plan demonstrates that the decision regarding his termination was made before the application period was closed and prior to the Transition Team meeting. He also questions the timing of McGraw's application, finding it suspicious that McGraw applied before the job announcement was published. Kalinoski further challenges the decision making process, noting that the Defendants did not use many common techniques such as job interviews, and the Transition Team was made up of individuals with partisan ties who considered candidates' political affiliation during the process.

Defendants argue that Kalinoski's evidence is insufficient to withstand summary judgment. They point out that they retained several employees who had Republican ties. They further argue that prior Commissioners Cordaro and Munchak had used political

16

patronage to fill the positions at the OPD, and that they were simply ending that system. Defendants also explain that the candidates they chose were simply more qualified and had better recommendations than Kalinoski. McGraw had more trial experience than Kalinoski, plus there was some negative feedback about Kalinoski during the Transition Team meetings. Finally, Defendants defend their process for selecting candidates, noting that their restructuring was based on complaints from judges. They dispute Kalinoski's assertion that the decisions were made based on political connections, and characterize hired employees like McGraw as having "personal" or "family" ties to the Transition Team as opposed to political ties to the Democratic Party or the Washo-O'Brien campaign. And the Defendants assert that the Transition Team members' prior activity with the Washo-O'Brien campaign does not automatically render their hiring recommendations biased and invalid, pointing to the qualifications of each member.

Defendants' arguments may be persuasive, but Kalinoski has also presented persuasive evidence. This suggests that, as in *Galli*, it is "premature" to grant the Defendants summary judgment as to causation. *Id.* Again, looking at the evidence in the light most favorable to Kalinoski, there is a genuine issue of material fact as to whether Kalinoski's political affiliation or, alternately, the desire to hire a politically favored candidate was the substantial or motivating factor in his termination. Thus, Kalinoski has adequately supported a prima facie finding of political discrimination.

### c. Nondiscriminatory Justifications

Because Kalinoski has met his burden of proof, the burden now shifts to the Defendants to prove that they would have terminated Kalinoski regardless of his protected activity. Summary judgment is inappropriate on this element as well, however,

upon construing the facts in the light most favorable to Kalinoski. The factual disputes surrounding the causation issue are also relevant to Defendants' nondiscriminatory justification for their decision. *See Lint v. Cnty. of Fayette*, No. 10-321, 2011 WL 2650014, at *8 (W.D. Pa. 2011). Both parties have produced evidence that could lead a reasonable jury to find in their favor, and therefore summary judgment is inappropriate.

### D. Punitive Damages

Defendants also moved for summary judgment on the issue punitive damages for O'Brien and Washo.[3] Under § 1983, a jury may assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). In the context of punitive damages in civil rights cases, the term "'reckless indifference' refer[s] not to the egregiousness of the [defendant's] conduct, but rather to the [defendant's] knowledge that it may be acting in violation of federal law." *Alexander v. Riga*, 208 F.3d 419, 430 (3d Cir. 2000) (quoting *Kolstad v. Amer. Dental Ass'n*, 572 U.S. 526, 535 (1999)). Defendants argue that punitive damages would be inappropriate here because Kalinoski has not presented any evidence of an evil motive or a reckless indifference that would meet this standard. Kalinoski, however, argues that Defendants acted with knowledge that they might be violating federal law. Looking at the facts in the light most favorable to Kalinoski, there is a genuine issue of material fact as to whether Defendants acted with reckless indifference to Kalinoski's

---

[3] There is no punitive damages issue regarding the claim against the County because punitive damages are not available in a suit against a municipality. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

rights.  Because fact questions still remain on the issue of the constitutional violation, it is premature to grant summary judgment on the issue of punitive damages.

### III. Conclusion

For the reasons explained above, Defendants' motion for summary judgment (Doc. 36) will be denied.  An appropriate order follows.


  9/12/2011                                         /s/ A. Richard Caputo
Date                                               A. Richard Caputo
                                                   United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRAIG KALINOSKI, | |
| Plaintiff, | NO. 3:10-CV-0314 |
| v. | |
| LACKAWANNA COUNTY, et al., | (JUDGE CAPUTO) |
| Defendants. | |

**ORDER**

**NOW**, this  12th  day of September, 2011, **IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Doc. 36) is **DENIED** and this matter shall be set for trial.

                                                   /s/ A. Richard Caputo
                                                   A. Richard Caputo
                                                   United States District Judge